UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LINDITA COKU, M.D.,

                          Plaintiffs,                    17-cv-2488 (PKC)

          -against-
                                                          OPINION AND
                                                          ORDER
THE NEW YORK PRESBYTERIAN
HOSPITAL, TATYANA ZAYTSEVA, and
LUBYA KONOPASEK,

                          Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

          Plaintiff Lindita Coku, M.D., is a woman of Albanian national origin who

previously served as a chief resident in a cardiothoracic surgical residency training program at

The New York Presbyterian Hospital ("NYPH").  Mid-way through one of her surgical rotations,

she was reassigned out of the rotation, and at the conclusion of the entire residency program, she

was denied a certificate of completion.

          Dr. Coku now asserts twelve claims against NYPH, Tatyana Zaytseva, and Lubya

Konopasek.[1]  Seven claims are based on allegations that defendants created a hostile work

environment and discriminated against Dr. Coku because of her gender and national origin.

Those claims arise under Title VII of the Civil Rights Act, New York State Human Rights Law §

296 ("NYSHRL"), and New York City Human Rights Law § 8-107 ("NYCHRL").  The

remaining five claims are for retaliation pursuant to New York Labor Law § 741, breach of

---

[1] Dr. Coku originally brought this action against six defendants.  On June 19, 2017, three defendants were dismissed
pursuant to a stipulation by the parties.  (Doc. 12).

contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and intentional interference with prospective economic advantage.

Dr. Coku has withdrawn her claims against defendants Tatyana Zaytseva and Lubya Konopasek and her claim under New York Labor Law § 741. (Doc. 43 at 6). Those claims are accordingly dismissed. NYPH has moved for summary judgment with respect to Dr. Coku's remaining claims. For the reasons that follow, the Court grants defendants' motion with respect to all of Dr. Coku's federal claims.

THE UNDISPUTED FACTS

The facts discussed in this Opinion are undisputed except where otherwise noted.[2] The Court has drawn all reasonable inferences in favor of the plaintiff, as the nonmovant. See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

*Dr. Coku's Admission to the Cardiothoracic Program*

Dr. Coku spent one year as a resident in a cardiothoracic surgery residency training program offered by NYPH's Weill Cornell Medical Center campus (the "Cardiothoracic Program"). (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1). The Cardiothoracic Program is a two-year residency program for post-graduate surgical residents who have already completed five years of general surgical residency and seek to specialize in cardiothoracic surgery. (Def. 56.1 ¶¶ 1-2; Pl. 56.1 Resp. ¶¶ 1-2).

---

[2] Dr. Coku has not submitted a statement, as required by Local Civil Rule 56.1(b), but has objected to certain facts presented in defendants' Rule 56.1 Statement. The Court declines to consider any portion of the record that the parties have failed to point out in the relevant sections of their briefs, in defendants' 56.1 Statement, or in Dr. Coku's objections to defendants' 56.1 Statement. See Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("[A] court 'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, [but] it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement."); CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 125 (2d Cir. 2013) ("[T]he District Court is not required 'to scour the record on its own in a search for evidence' when the plaintiffs fail to present it."). Any citation to defendants' Rule 56.1 Statement or Dr. Coku's corresponding objections incorporates by reference the documents and testimony cited therein.

The Cardiothoracic Program only employs six residents at a time, three in the first year of the program and three in the second. (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4). Second-year residents are referred to as "chief residents" or "senior fellows." (Id.). Dr. Coku did not participate in the first year of the Cardiothoracic Program but was hired to serve as a chief resident in the second year of the program from July 1, 2014 through June 30, 2015 after another resident withdrew following his first year. (Def. 56.1 ¶¶ 1, 6; Pl. 56.1 Resp. ¶¶ 1, 6).

Dr. Karl H. Krieger, the Program Director of the Cardiothoracic Program, testified that because of the other resident's withdrawal, the hospital needed a new resident to perform the specific rotations assigned to him. (Def. 56.1 ¶¶ 5, 11; Pl. 56.1 Resp. ¶¶ 5, 11). He testified that whoever replaced the departing resident was accordingly required to complete one thoracic rotation from July to September 2014, one cardiac rotation from October to December 2014, a second cardiac rotation from January to March 2015, and a second thoracic rotation from April to June 2015.[3] (Id.). Dr. Krieger interviewed and hired Dr. Coku for the position and testified that he informed Dr. Coku before she accepted the position about the required rotations. (Def. 56.1 ¶¶ 3, 7, 10; Pl. 56.1 Resp. ¶¶ 3, 7, 10). Dr. Coku denies that Krieger mentioned the requirement of thoracic service during her interview. (Pl. 56.1 Resp. ¶ 10).

When Dr. Krieger offered Dr. Coku the position, he was aware that Dr. Coku was female and of Albanian descent. (Def. 56.1 ¶¶ 8, 9; Pl. 56.1 Resp. ¶¶ 8, 9). Dr. Coku accepted the position and served as a second-year resident in the Cardiothoracic Program alongside two other second-years and three first-years. (Def. 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12). Of the three first-

---

[3] Cardiac surgery is surgery on, or relating to, the heart, while thoracic surgery is surgery on organs and areas in the chest other than the heart, such as the lungs and esophagus. (Def. 56.1 ¶¶ 28-29; Pl. 56.1 Resp. ¶¶ 28-29). Both cardiac and thoracic surgery involve delicate, difficult, and often lengthy procedures that may require invasive techniques such as cutting open the chest. (Def. 56.1 ¶ 30; Pl. 56.1 Resp. ¶ 30).

year residents who served alongside Dr. Coku, one first-year resident was female (Dr. Erin Iannacone), and one first-year was of Albanian national origin (Dr. Bledi Zaku). (Def. 56.1 ¶ 13-15; Pl. 56.1 Resp. ¶ 13-15). Both Drs. Iannacone and Zaku satisfactorily completed both years of the Cardiothoracic Program and received certificates of completion. (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15).

*Dr. Coku's Reassignment and Denial of a Certificate of Completion*

In March 2015, Dr. Coku spoke to Jeannette Torres, a program coordinator who worked with Dr. Krieger, and requested that Dr. Krieger "not send me back to thoracic service because of mistreatment, abuse, bullying and also [because] I was not thoracic track. I did not need thoracic cases. I did not need any more thoracic exposure, although I would have not minded that." (Coku Dep. at 129-31). In May 2015, Dr. Krieger relieved Dr. Coku of her duties on the thoracic surgery service and assigned her to a non-supervisory position on a cardiac surgery service that did not involve unsupervised patient contact or interaction with junior residents. (Def. 56.1 ¶¶ 45-46; Pl. 56.1 Resp. ¶¶ 45-46). Dr. Coku did not complain about her removal from the thoracic service. (Def. 56.1 ¶ 47; Pl. 56.1 Resp. ¶ 47). She remained in the Cardiothoracic Program through June 2015 and was paid her full contracted salary. (Def. 56.1 ¶ 48; Pl. 56.1 Resp. ¶ 48).

In late June 2015, NYPH held a graduation dinner for two residents, Drs. Bao-Thuy Duy Hoang and Usman Ahmad, who served as second-year residents alongside Dr. Coku and successfully completed their two years in the Cardiothoracic Program. (Def. 56.1 ¶ 59; Pl. 56.1 Resp. ¶ 59). At the dinner, Drs. Hoang and Ahmad received certificates of completion. (Def. 56.1 ¶¶ 60-62; Pl. 56.1 Resp. ¶¶ 60-62). Dr. Coku was invited to, and attended, the dinner but did not receive a certificate of completion. (Id.). Instead, Dr. Krieger provided Dr. Coku

with a signed letter, which stated "This letter is confirmation that Dr. Lindita Coku served as Sr. Fellow from July 1, 2014 through June 30, 2015 in the Department of Cardiothoracic Surgery at the New York-Presbyterian-Weill Cornell Medical Center." (Def. 56.1 ¶ 64; Pl. 56.1 Resp. ¶ 64).

In his declaration, Dr. Krieger stated that the decision to not award Dr. Coku a certificate was the consensus of the leadership in the Cardiothoracic Program. (Def. 56.1 ¶ 63; Pl. 56.1 Resp. ¶ 63). He explained that "Coku did not serve as chief resident for the complete twelve-month period because I removed her from the thoracic surgery service due to poor performance. . . . [The certificate] is an emblem of successful completion of our very demanding Cardiothoracic Program . . . . Unfortunately, Dr. Coku was unsuccessful in the [program] and did not earn this certificate." (Id.; Krieger Decl. ¶ 25).

*Dr. Coku's Performance in the Cardiothoracic Program*

Defendants argue that Dr. Coku's poor performance in the Cardiothoracic Program ultimately led to her removal from the thoracic service and her not receiving a certificate of completion. Defendants' evidence of poor performance includes performance evaluations submitted by Dr. Coku's supervisors, standardized test scores, and emails written by Dr. Brendon Stiles documenting her performance.

Dr. Coku's performance evaluations each list several categories and allow the evaluator to rate her performance on a scale from 1 and 5 in each category. (Def. 56.1 ¶ 39; Pl. 56.1 Resp. ¶ 39). Level 1 is designated as "Novice," level 2 as "Advanced Beginner," level 3 as "Competent," level 4 as "Proficient," and level 5 as "Expert." (Id.). Evaluators could also give a rating halfway in between any two levels. (Id.). After Dr. Coku's first thoracic surgery rotation from July through September 2014, Drs. Subroto Paul and Brendon Stiles each completed an

evaluation.  (Def. 56.1 ¶ 38; Pl. 56.1 Resp. ¶ 38).  Dr. Paul gave her a level 1 or 1.5 rating in 13 of 15 categories and a level 2 in the other two categories.  (Def. 56.1 ¶ 40; Pl. 56.1 Resp. ¶ 40).  Dr. Stiles gave her a level 1 or 1.5 rating in 8 of 15 categories, and a level 2 or 2.5 in 7 of 15 categories.  (Def. 56.1 ¶ 41; Pl. 56.1 Resp. ¶ 41).  After her second thoracic surgery rotation from April to mid-May 2015, Dr. Paul gave her a level 1 in all 15 categories, while Dr. Stiles gave her a level 1 or 1.5 in 5 of 15 categories, a level 2 in 7 categories, and a level 3 in 3 categories.  (Def. 56.1 ¶¶ 51-52; Pl. 56.1 Resp. ¶¶ 51-52).

Dr. Coku took a standardized examination administered by the Thoracic Surgery Directors Association ("TSDA") in March 2015.  (Def. 56.1 ¶ 53; Pl. 56.1 Resp. ¶ 53).  The exam was mandatory for all cardiothoracic residents.  (Id.).  Dr. Coku scored in the 17th percentile for all residents taking the exam and in the 3rd percentile for residents in her post-graduate year.  (Def. 56.1 ¶ 54; Pl. 56.1 Resp. ¶ 54).

Dr. Stiles sent three emails about Dr. Coku's performance during her first thoracic rotation.  On July 20, 2014, Dr. Stiles emailed Laura Seche, R.N., with a copy to Dr. Krieger and Dr. Leonard Girardi, stating that Dr. Coku's "organizational skills aren't particularly strong and she has had a difficult time focusing on what's important.  Because of that, she has had a tough time finishing up rounds in a timely fashion in the mornings."  (Def. 56.1 ¶ 35; Pl. 56.1 Resp. ¶ 35).  On August 27, 2014, Dr. Stiles emailed Jeffrey Port, M.D., an attending thoracic surgeon, stating that Dr. Coku "totally wiffed on" diagnosing a patient who was transferred to NYPH "in frank tamponade," which means with fluid around the heart.  (Def. 56.1 ¶ 36; Pl. 56.1 Resp. ¶ 36).  On September 10, 2014, Dr. Stiles emailed Nasser Altorki, M.D., Director of the Division of Thoracic Surgery, stating that a patient was "doing poorly" due to complications involving a "massively distended bowel" and that Dr. Coku "again missed the boat on this" because "she

was aware of problems in morning and as usual didn't actively follow up" or notify Dr. Stiles about the patient's condition. (Def. 56.1 ¶ 37; Pl. 56.1 Resp. ¶ 37).

Dr. Stiles sent one email about Dr. Coku's performance during her second thoracic rotation. On April 25, 2015, he emailed Dr. Krieger, with a copy to Dr. Girardi, stating "we have continued to have multiple problems with Lindita on the service" and listed the following four problems:

> [1] [Coku] has demonstrated a very limited understanding of basic principles of thoracic surgery. In most cases, she makes no effort to read about patients or cases until immediately before the operation. She has made no effort to involve herself in consults, even complex ones. . . .
>
> [2] She often fails to report important data points, while focusing on trivial matters. She neglected to tell Dr. Altorki last week that one of his lung resection patients had gotten a CT of the chest the day before.
>
> [3] She is routinely the last person on the team to show up in the OR. This is often after the patient is prepped and draped or even after the operation has begun. She typically cites that she was busy with other work. Because of this, she has absolutely no ability to position and set up a patient. This was illustrated to me when we had the transfer from MSKCC who needed a sternotomy for a cardiac injury. She had no idea the sequence of preps for cardiac cases or how to place the drapes. . . .
>
> [4] She never moves from OR to OR to check on patients or cases, but instead disappears for long periods of time. I have done several complex cases with the second year alone in the last few weeks. I happened to see Lindita in the hall after I had finished a second case two weeks ago and she asked me if I was still on the first case. She had no idea. This was despite the fact that her OR was empty. And her stated excuse that she was checking patient information and rounding with the NPs was flatly rejected by the NP on call for service that day who said that Lindita only called for less than a minute to get updates. Meanwhile, she had no idea that one of the patients operated on earlier in the day had $PCO_2$s > 60 in the PACU.

(Def. 56.1 ¶¶ 42-44; Pl. 56.1 Resp. ¶¶ 42-44).

In the same email to Dr. Krieger, Dr. Stiles stated that "All of these things are

perhaps teachable and may improve with time. You certainly seemed to do a good job getting her into shape in that regard. However, in my opinion, she has several deficits which she has consistently demonstrated are not correctable or which she has no desire to correct. These all seemed to come to a head this week." (Id.). He then enumerated the five deficits as follows:

1) Patients do not like her, which to me is an obvious sign that she exhibits little interest and attentiveness to their needs. We were rounding this week when I jokingly told one of my patients that I had heard she was grumpy this morning. She pointed directly at Lindita and said, "that is because I don't like her."

2) She is routinely late. One day last week she didn't show up for morning rounds per the junior resident until the rounds were almost over. On Wednesday she didn't start rounding until after 7 despite having a large service and two cases starting at 7:30.

3) She is mean and abusive to the junior residents. She apparently snapped at the second year resident in front of several people this week for spending too much time talking to the patients. This is a very important point as it is hurting our ability to get good general surgery residents who want to rotate. It is known throughout general surgery that she is exceedingly painful to work with and quick to blame. None of the residents want to be on service with her. We are trying to get extra help in June and this is a serious issue. I believe it also causes us to lose face with general surgery if we can't demonstrate that we have a competent surgeon and doctor running our service.

4) She snapped at our new pulmonology attending Eugene this week, also in front of several people. I am told by two independent sources (confirmed by Eugene) that he harmlessly asked her [if] she wanted to take the foley out on one of his patients. She snapped and said something to the effect of "you thoracic attendings think you have to manage every little detail . . ." I was later told by the intern on the service that he was specifically told by Lindita not to go to the ambulatory [ORs] to help Eugene that day, but should instead hang around in the main OR in case anyone needed him. This is obviously unacceptable.

5) Finally, she left this week to go to an out-of-town conference Wed afternoon until Sunday. She told me the day before, but mentioned it to no one else on the service. Nor did she ask anyone. She simply said to me that she was going to the conference to present on TAVR. (This raises another issue as I am told she wanted to present some of our data without first vetting it through anyone). That day, she simply left after the first

case and made no effort to tie up any loose ends.

(Id.).

> Dr. Stiles concluded the email by stating:
>
> I am not sure why we are unable to engage her or demonstrate any improvement. Each of us have actually made an effort. I suspect that her lack of interest and the lack of respect that she shows us is because she is primarily interested in cardiac rather than thoracic. I certainly understand if that is the case, but at the same time would expect that she could demonstrate some amount of professionalism and apply herself to the service. At this point, however, I am concerned that her time with us is not salvageable. She has completely lost the faith of all of us. Because of this and because of her lack of interest and preparation, she is not doing any cases on our service. She particularly struggles with minimally invasive cases, which unfortunately for her are the majority of our work. If you have any ideas how we can make this work better, I would like to hear them. I am truly concerned about how having her on the service affects our ability to get good general surgery residents who are willing to rotate.

(Id.).

Dr. Coku disputes defendants' evidence of her poor performance. As evidence of her good performance, Dr. Coku has presented the declarations of Dr. Robert Poston, a professor who taught and supervised her from 2008-2010 during a prior surgical residency at Boston University, Dr. Galal Ghaly, a first-year resident that worked with Dr. Coku in her thoracic rotations, and Dr. Gregory Kerr, an attending physician who worked with Dr. Coku during the Cardiothoracic Program. Dr. Poston attested to her good performance in the Boston University program, Drs. Ghaly and Kerr attested to her good performance during the Cardiothoracic Program, but none of them discussed her performance evaluations, her standardized test scores, or the incidents Dr. Stiles mentioned in his emails. (Ghaly Decl. ¶¶ 2-5; Poston Decl. at 1-5; Kerr Decl. ¶¶ 3-6). Dr. Coku has also presented a transcript of the speech that Dr. Krieger delivered at the graduation dinner for Drs. Hoang and Ahmad, in which he praised her work in

her cardiac rotation with him, stating that she "did a great job." (Coku Decl., Ex. 1). During his deposition, Krieger similarly testified "If you're referring to the three months that she spent with me, she did a relatively good job," but he noted "I received multiple complaints about her from the other services." (Krieger Dep. at 91).

*Dr. Coku's Evidence of Discrimination*

Most of Dr. Coku's evidence of discrimination relates to Dr. Stiles's conduct. Specifically, Dr. Coku testified that Stiles referred to her as "dumb," "stubborn," "clueless" and "hardheaded" without basis, that he ignored her contributions, and that he treated her worse than the male residents and interns. (Coku Decl. ¶¶ 159-61; Coku Dep. at 140, 160-61, 176). In her declaration and deposition testimony, she describes a number of specific instances of mistreatment by Dr. Stiles. In mid-August 2014, for instance, she claims that after Dr. Stiles authorized a patient to be removed from the Post Anesthesia Care Unit ("PACU") after a surgery, Dr. Coku asked him "Who cleared her from the PACU prematurely?," which caused Dr. Stiles to become "enraged" and say "You have no clue, you are stubborn women [sic], you will not survive this service." (Coku Decl. ¶ 60). Based on that interaction, she concluded that "[Stiles] was enraged because I questioned his judgment." (Id.).

Additionally, she asserts that "there were multiple instances of Dr. Stiles engaging in conduct that presented serious risks to patients, some of whom died, and he was infuriated when I presented or wanted to present these at the appropriate [Mortality & Morbidity ("M&M") conference]. Dr. Stiles was then in a relatively junior position and he was threated [sic] if the truth were publicly disclosed and, so, he did whatever he could to hide the facts."[4] (Id. at ¶ 63).

---

[4] NYPH's cardiothoracic surgery service holds weekly M&M conferences, generally attended by all attending physicians and residents and other medical personnel, where residents present case studies of recent patient deaths or complications. (Def. 56.1 ¶ 55; Pl. 56.1 Resp. ¶ 55).

For instance, in an M&M conference in early August 2014, Dr. Coku brought up an instance where a patient developed a pulmonary embolism after Dr. Stiles refused to implement a preventative measure she suggested. (Coku Decl. ¶ 59). As a result, Dr. Stiles was "subject to criticism and he became enraged at [Dr. Coku] for making him look bad in front of his peers." (Id. at ¶ 59). At two later M&M meetings, in September 2014 and April 2015, she brought up two additional incidents where she perceived Dr. Stiles making mistakes that led to complications and death. (Id. at ¶ 66-67). After one of these M&M meetings, she claims that Dr. Stiles "physically grabbed me and told me . . . that he would see to it that I would not be able to survive at Cornell." (Coku Decl. ¶ 93).

She also recounts conversations she had with nurse practitioners about Dr. Stiles. In early October 2014, for instance, she testified that she spoke to Nurse Seche and asked her "I am sorry but I really want to share with you that Dr. Stiles has been mistreating me and treating me completely different from my classmates, from male fellows. . . . but is it something isolated, a behavior of Stiles against me, or this is something that it's normal for him with female fellows or females?" (Coku Dep. 189-90). According to Dr. Coku, Seche responded "Oh, don't worry. That's what he does with women. He hates women. You know that he is a twin brother. He has a twin brother, he is a twin, and his mother favored his twin brother and she did not favor him and he—he hates women." (Id.).

Dr. Coku also cites generally to a 34-page transcription of a recorded conversation between herself and two nurse practitioners (whom she recorded without their knowledge or permission), and a 13-page transcription of a conversation between her and a woman named Magda Holland (which took place after Dr. Coku's departure from NYPH). (Coku Decl. ¶ 94, Ex. 9; Pl. Br. at 17). She claims that these transcriptions document a "pattern

of abuse" and in which "[t]he discrimination at NYPH/Cornell is well-described." (Id.). She points to no specific statements in the transcripts. The only discussion fathomably related to Dr. Coku's gender or national origin was one nurse practitioner's statement that "I have not seen any women that (unintelligible) in [thoracic]," to which the another nurse responded "Not one woman (unintelligible)" and when the nurses recounted a story of some third party confronting Dr. Stiles about his treatment of a female nurse of Brazilian national origin by saying "Why can't you just treat her like a human being?" (Coku Decl., Ex. 10 at 13-14). The conversation with Holland, a "scrub technician" that worked with Dr. Coku, did not contain anything about national origin or gender. Holland did tell Dr. Coku, however, that "[t]he mistreatment of fellows . . . never stopped [after Coku left], and I don't think it will stop . . . But in your case I mean it was just a little bit . . . over the top" and "I don't know . . . why it was such a vendetta against you in particular." (Coku Decl., Ex. 9 at 4-5).

Additionally, Dr. Coku testified that defendant Nurse Zaytseva told her that a female Pakistani resident, Dr. Zarrush Khan, did not receive a certificate and warned her "You got to watch out. . . . With females, especially Stiles, he is very dangerous. He could discriminate females, especially foreign doctors." (Coku Dep. at 185-86). However, Dr. Coku testified that when she called Dr. Khan, Dr. Khan told her that she did in fact receive a certificate. (Coku Dep. at 421-22). Additionally, Dr. Coku concedes that she never observed Stiles treat either Dr. Iannacone, the female first-year, or Dr. Zaku, the Albanian first-year, in a discriminatory manner. (Def. 56.1 ¶¶ 86-87; Pl. 56.1 Resp. ¶¶ 86-87).

Dr. Coku has also presented Dr. Ghaly's declaration, in which Dr. Ghaly states "Dr. Stiles . . . didn't give Dr. Coku the same learning opportunities he gave other male Clinical Fellows. For example, he would occasionally offer in the OR to assist other Fellows to perform

his cases . . . as primary surgeon and taking them through the steps of the surgery as a faculty is indeed supposed to do in a training program, but Dr. Coku told me he never asked her to perform one." (Ghaly Decl. ¶¶ 2-5).

With respect to national origin, Dr. Coku presents an email from a nurse practitioner to Dr. Stiles, dated July 21, 2014, wherein the nurse practitioner states "By the way, [Coku] did start walking around one morning without the NP but didn't tell them why she was doing it, so they figured she just left without them. Maybe it's a cultural thing, maybe something else or maybe she's simply not thinking in an organized fashion, but I should think this organizational skill should have taken place long ago in her basic surgical training." (Lancia Decl., Ex. 24). Dr. Stiles responded "Thanks. I am trying to give her the benefit of the doubt and hoping it is cultural. That said, she is well behind the basic surgical training curve. Can't imagine her on LG service at this point. Hopefully we can get some improvement." (Id.).

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

In an employment discrimination case where "the merits turn on a dispute as to the employer's intent," courts exercise caution in granting summary judgment to a defendant. Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). In such cases, "[n]o one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination." Walsh v. N.Y. City Housing Auth., 828 F.3d 70, 76 (2d Cir. 2016). "Even in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment" and summary judgment is appropriate when there is no genuine issue of material fact. Holcomb, 521 F.3d at 137 (citation omitted); Schiano v. Quality Payroll Sys., Inc.,

445 F.3d 597, 603 (2d Cir. 2006); see Burke v. Gutierrez, No. 04 CIV. 7593(PKC), 2006 WL 89936, at *4 (S.D.N.Y. Jan. 12, 2006), aff'd sub nom. Burke v. Evans, 248 F. App'x 206 (2d Cir. 2007) ("[W]here an employer provides convincing evidence explaining its conduct and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact.").  Courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

DISCUSSION

Dr. Coku asserts federal claims against NYPH pursuant to Title VII of the Civil Rights Act and state law claims against NYPH pursuant to NYSHRL § 296, NYCHRL § 8-107, and the common law of breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and intentional interference with prospective economic advantage.

I.  Dr. Coku's Federal Claims Under Title VII of the Civil Rights Act

Dr. Coku's federal claims against NYPH under Title VII of the Civil Rights Act are for gender and national origin discrimination and creating a hostile work environment.  The Court will discuss the discrimination claims first and the hostile work environment claim thereafter.

A.  Dr. Coku's Claims for Gender and National Origin Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for employers "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a).  In McDonnell Douglas Corp.

v. Green, 411 U.S. 792 (1973), the Supreme Court articulated a burden-shifting framework for analyzing Title VII discrimination claims. The framework consists of three steps. First, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination." Holcomb, 521 F.3d at 138. To make out a prima facie case under the first step, a plaintiff must show that he or she (1) "was a member of a protected class," (2) "was qualified for the position he [or she] held," (3) "experienced an adverse employment action," and (4) "the adverse employment action occurred under circumstances that give rise to an inference of discrimination." Jantz v. Emblem Health, No. 10-cv-6076 (PKC), 2012 WL 370297, at *6 (S.D.N.Y. Feb. 6, 2012) (citing Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004)).

If the plaintiff succeeds at the first step, "the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action." Holcomb, 521 F.3d at 138. "The defendant's burden in this regard is only one of production, not of persuasion. . . . the defendant need not persuade the Court that the proffered purpose was in fact its reason for having taken the challenged employment action." Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334, 341 (S.D.N.Y. 2009) (citing Fisher v. Vassar College, 114 F.3d 1332, 1335–36 (2d Cir. 1997)).

"If the defendant articulates such a reason, the presumption of discrimination [raised by the prima facie case] drops out, . . . and the plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); see Hardekopf v. Sid Wainer & Son, No. 02-cv-3251 (LAP), 2004 WL 2199502, at *6 (S.D.N.Y. Sept. 29, 2004) (plaintiff must show that "the defendant was actually motivated, at least in part, by discrimination"). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is

shown <u>both</u> that the reason was false, <u>and</u> that discrimination was the real reason." <u>Borzon v.</u> <u>Green</u>, No. 18-2211, 2019 WL 2754960, at *2 (2d Cir. July 2, 2019) (quoting <u>St.</u> <u>Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993)). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Holcomb</u>, 521 F.3d at 138.

Dr. Coku has not presented evidence from which a reasonable jury could conclude that NYPH discriminated against her on the basis of gender or national origin. Assuming that Dr. Coku has presented evidence sufficient to establish a prima facie case of discrimination, NYPH has advanced a "legitimate, non-discriminatory reason" for removing her from the thoracic rotation and denying her a certificate of completion. The Court notes that Dr. Coku argues she suffered the following "adverse employment actions": being "transferred out of the thoracic surgery department," not receiving a certificate of completion, being "denied any remedial program or measures after Dr. Stiles complained about her," being "denied receipt of employment evaluations," and being "harassed, mistreated, bullied, and physically assaulted in a manner not experienced by male or U.S. born individuals." (Pl. Br. at 11). In discussing the second and third steps of the <u>McDonnell</u> framework, the Court assumes, without deciding, that only the transfer and the denial of a certificate were "adverse employment actions" because Dr. Coku has made no showing as to how any of the latter three constitute an "adverse employment action," which is a "materially adverse change in the terms and conditions of employment." <u>See</u> <u>Smith v. City of New York</u>, No. 17-cv-970 (VEC), 2019 WL 2491536, at *11 (S.D.N.Y. June 13, 2019); <u>Feingold</u>, 366 F.3d at 152 ("Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices . . . unique to a particular situation." (internal quotation marks omitted)).  With respect to those two adverse employment actions, Dr. Krieger explicitly states in his declaration that he "removed [Dr. Coku] from the thoracic surgery service due to poor performance" and that she did not receive a certificate because "[she] was unsuccessful in the [program] and did not earn this certificate."  (Def. 56.1 ¶ 63; Pl. 56.1 Resp. ¶ 63; Krieger Decl. ¶ 25).  The emails documenting her deficiencies, her performance evaluations, and her standardized test results all corroborate Dr. Krieger's statement that Coku was reassigned and denied a certificate due to poor performance.

In response to NYPH's asserted "legitimate, non-discriminatory reason" and its evidence thereof, Dr. Coku has not presented any evidence upon which a reasonable jury could conclude that NYPH's reason was a pretext for discrimination.  In sum, Dr. Coku's evidence of discriminatory intent consists of the following: conversations she had with others about Dr. Stiles and a former female Pakistani resident, her and Dr. Ghaly's assertion that she was treated less favorably than male residents, remarks by Dr. Stiles and a nurse practitioner about her attitude, intellect, and "culture," incidents of mistreatment by Dr. Stiles, and evidence of her good performance before and during the Cardiothoracic Program.  Even considering all of this evidence in its totality, a conclusion that NYPH was motivated in any part by discriminatory intent would be based on "mere speculation and conjecture."  See Bickerstaff, 196 F.3d at 448.

For one, the conversations Dr. Coku had with nurses about Dr. Stiles and the former Pakistani resident and the general assertions by Drs. Coku and Ghaly that Dr. Coku was treated less favorably than male residents are no more than "vague recollections of conversations with co-workers, anecdotes based on hearsay, and other unsupported speculation," which are not sufficient to support a finding of discriminatory intent.  Burke v. Evans, 248 F. App'x 206, 208

- 18 -

(2d Cir. 2007).  This is especially so where Dr. Coku concedes that a female resident (Dr. Iannacone) and an Albanian resident (Dr. Zaku) serving alongside her both received certificates of completion and, to her knowledge, did not experience discriminatory treatment from Dr. Stiles.

Even assuming that Dr. Coku experienced unfavorable treatment compared to her male counterparts, Coku cannot raise an inference of discrimination based upon this disparate treatment because she has not presented evidence that she and her male counterparts were "similarly situated in all material respects." Smith, 2019 WL 2491536, at *10 (citing Mandell v. Cty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)).  Specifically, Dr. Coku has presented no evidence to suggest that her male counterparts were similarly perceived to be performing poorly, that they received poor evaluations or performed poorly on examinations, or that they similarly questioned Dr. Stiles's authority and highlighted his mistakes in M&M meetings.  See Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) (requiring a "plaintiff to show that similarly situated employees who went undisciplined engaged in comparable conduct" to raise inference of discrimination); Hardekopf v. Sid Wainer & Son, No. 02-cv-3251 (LAP), 2004 WL 2199502, at *7 (S.D.N.Y. Sept. 29, 2004) ("Plaintiff has not shown, or even alleged, that any other similarly situated employee performed poorly to a substantially similar degree but escaped termination.").

Additionally, no reasonable jury could infer discriminatory intent based on evidence that Dr. Stiles called Dr. Coku "dumb," "clueless," "hardheaded," and a "stubborn women [sic]" and stated that he "hop[ed]" her lack of organizational skills was "cultural."  Most of these remarks are neutral with respect to national origin and gender, while the "stubborn women [sic]" and "cultural" comments are merely "stray remarks" that are insufficient to

support a reasonable inference of discriminatory intent.  See Smith v. City of New York, No. 17-cv-970 (VEC), 2019 WL 2491536, at *11 (S.D.N.Y. June 13, 2019) (reasoning that "facially race-neutral" remarks did not "evinc[e] an intent to discriminate"); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) ("[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination."); see, e.g., Dixon v. Int'l Fed'n of Accountants, No. 09-cv-2839 (HB), 2010 WL 1424007, at *4 (S.D.N.Y. Apr. 9, 2010), aff'd, 416 F. App'x 107 (2d Cir. 2011) (insufficient evidence of discriminatory intent where a co-worker made a "stray remark[]" in a meeting that "she [couldn't] believe that [the employer] could hire a black Jamaican woman at 48 years of age"); Trower v. Mount Sinai Hosp., No. 16-cv-4322 (PKC), 2018 WL 4283724, at *6 (S.D.N.Y. Sept. 6, 2018) (same where supervisor referred to plaintiff as "you people," "young lady," "incompetent," "slow," and "not like the rest of the girls here").  Dr. Stiles's "cultural" remark is particularly devoid of probative value because, as Dr. Stiles put it, her "culture" would be a reason to "give her the benefit of the doubt" rather than a reason to treat her unfavorably.

Lastly, the incidents of mistreatment by Dr. Stiles and the evidence of Dr. Coku's good performance similarly reveal nothing about whether the action taken against her was motivated by discriminatory intent.  See, e.g., Borzon, 2019 WL 2754960, at *2 (holding that plaintiff's production of "some evidence countering Defendants' evaluation of [plaintiff's] effectiveness as a hospital administrator" was "insufficient . . . to support a finding of discriminatory animus").  Such evidence may create an issue of fact as to whether her performance warranted removal from a surgical rotation or denial of a certificate, but this Court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions." Id.

Indeed, her encounters with Dr. Stiles suggest that his alleged animosity toward her was motivated by her conduct, rather than her gender or national origin. In describing these encounters, all of which took place either after she questioned his decisions or highlighted his mistakes in an M&M meeting, she concluded that "[Stiles] was enraged because I questioned his judgment," "there were multiple instances of Dr. Stiles engaging in conduct that presented serious risks to patients, some of whom died, and he was infuriated when I presented or wanted to present these at the appropriate M&M," and "he became enraged at me for making him look bad in front of his peers." (Coku Decl. ¶ 59-60). Thus, even if her poor performance were a pretext for removing her from thoracic service and denying her a certificate of completion, there is no evidence upon which a reasonable jury could conclude that it was a pretext for discrimination. See Borzon, 2019 WL 2754960, at *2 ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.").

In sum, Dr. Coku's evidence of discrimination, considered in its totality, does not allow a reasonable jury to conclude that the decision to remove her from thoracic service and deny her a certificate completion was motivated in any part by her gender or national origin. The Court accordingly dismisses her federal discrimination claims.

### B. Dr. Coku's Claim for Hostile Work Environment

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted). To establish a hostile work environment claim, a plaintiff must show (1) that "the harassment was sufficiently severe or pervasive to alter the conditions of [his or her] employment and create an abusive working environment" and (2) "a specific basis for

imputing the conduct creating the hostile work environment to the employer." Feingold, 366 F.3d at 149–50. Additionally, "[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic, such as race or national origin." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (citation and internal quotation marks omitted). Indeed, "[p]ersonal animosity and even unfair treatment are not actionable under Title VII unless discrimination is a motivating factor." Pesok v. Hebrew Union Coll.--Jewish Inst. of Religion, 235 F. Supp. 2d 281, 288 (S.D.N.Y. 2002), aff'd sub nom. Pesok v. Lutwak, 86 F. App'x 479 (2d Cir. 2004); see Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002) ("[M]any bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.").

"[T]he standard for establishing a hostile work environment is high." Feingold, 366 F.3d at 150. "[T]he misconduct . . . must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Id. (internal quotation marks omitted). "In considering whether a plaintiff has met this burden, courts should 'examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" Rivera, 743 F.3d at 20 (citation omitted). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Feingold, 366 F.3d at 150 (internal quotation marks omitted); see Schwapp, 118 F.3d at 110 ("[M]ere utterance of an . . . epithet which engenders

offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. . . . For racist comments, slurs, and jokes to constitute a hostile work environment, . . . there must be a steady barrage of opprobrious racial comments." (citations and internal quotation marks omitted)).

Dr. Coku has not presented sufficient evidence upon which a jury could conclude that she suffered a hostile work environment. Even if Dr. Coku suffered mistreatment at the hand of Dr. Stiles, for the same reasons discussed above, no reasonable jury could conclude that she suffered mistreatment "because of . . . [a] protected characteristic," rather than her poor performance or Dr. Stiles's "[p]ersonal animosity" towards her. Rivera, 743 F.3d at 20; Pesok, 235 F. Supp. 2d at 288. Because Dr. Coku has failed to present sufficient evidence from which a jury could conclude that her alleged mistreatment was motivated by discrimination, the Court grants summary judgment on her hostile work environment claim.

II. Dr. Coku's State Law Claims

In Dr. Coku's First Amended Complaint, she asserts that this Court has supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367. (Doc. 25 ¶ 6). Section 1367 authorizes courts to "decline to exercise supplemental jurisdiction" over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Court has dismissed Dr. Coku's Title VII claims. Within seven days of this Order, the parties shall show cause in writing why the Court should retain supplemental jurisdiction over Dr. Coku's remaining state law claims.

CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment (Doc. 45) is GRANTED with respect all of Dr. Coku's federal claims. The parties are instructed to

show cause in writing within seven days of this Order why the Court should retain supplemental jurisdiction over the state law claims.  The Clerk is directed to terminate defendants' motion.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        August 12, 2019